# EXHIBIT A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**

MEDTRONIC, PLC, formerly MEDTRONIC, INC.; KEITH JARO, an individual, and DOES 1 through 10, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

DR. DAVID RUSCHKE, an individual,

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

**¡AVISO!** Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

---

The name and address of the court is:
*(El nombre y dirección de la corte es):*

**CASE NUMBER:**
*(Número del Caso):*

Superior Court of California, County of Sonoma, 600 Administrative Drive, Santa Rosa CA 95403

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Dow W. Patten, SMITH PATTEN, 888 S.Figueroa St., Suite 2030, Los Angeles, CA 90017 415-402-0084

DATE: November 13, 2017
*(Fecha)*

Clerk, by _____ , Deputy
*(Secretario)*                    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

1   SMITH PATTEN
    DOW W. PATTEN, ESQ. (SBN: 135931)
2   888 S. Figueroa St., Suite 2030
    Los Angeles, CA 90017
3   Telephone: (213) 488-1300; 415-402-0084
    Facsimile: (213) 260-8501; 415-520-0104
4
    Attorney for Plaintiff
5   DR. DAVID RUSCHKE

**FILED**

**NOV 1 3 2017**

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA
By_____ DEPUTY CLERK

6          IN THE SUPERIOR COURT OF THE STATE CALIFORNIA

7                   FOR THE COUNTY OF SONOMA

8

9   DR. DAVID RUSCHKE, an individual,        ) Case No.: SCV- 261529
                                             )
10          Plaintiff,                       ) **COMPLAINT FOR DAMAGES AND**
                                             ) **INJUNCTIVE RELIEF**
11      v.                                   )
                                             ) **(1) WRONGFUL TERMINATION**
12  MEDTRONIC, PLC., formerly                )     **(*TAMENY*)**
    MEDTRONIC, INC.;  KEITH JARO, an         )
13  individual,  and DOES 1 through 10,      ) **(2) RETALIATION**
    inclusive,                               )     **Cal. Gov. Code § 12900, *et seq.* (FEHA)**
14                                           )
                                             ) **(3) DISABILITY DISCRIMINATION**
15          Defendants.                      )     **Cal. Gov. Code § 12900, *et seq.* (FEHA)**
                                             )
16                                           ) **(4) FAILURE TO ENGAGE IN THE**
                                             )     **INTERACTIVE PROCESS**
17                                           )     **Cal. Gov. Code § 12900, *et seq.* (FEHA)**
                                             )
18                                           ) **(5) SEXUAL ORIENTATION**
                                             )     **DISCRIMINATION**
19                                           )     **Cal. Gov. Code § 12900, *et seq.* (FEHA)**
                                             )
20                                           ) **(6) FAILURE TO ACCOMMODATE**
                                             )     **Cal. Gov. Code § 12900, *et seq.* (FEHA)**
21                                           )
                                             ) **(7) FAIURE TO PAY WAGES AND**
22                                           )     **EXPENSES  (Cal. Lab. Code §302)**
                                             )
23                                           ) **(8) FALSE LIGHT**
                                             )
24                                           ) **JURY TRIAL DEMANDED**
                                             )
25                                           )
                                             )
26                                           )
                                             )
27                                           )
                                             )
28

                                    1

               COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**BY FAX**

Plaintiff DAVID RUSCHKE ("Plaintiff" or "RUSCHKE") files this Complaint for Damages and Injunctive Relief, and complains of the named Defendants MEDTRONIC, PLC, formerly MEDTRONIC, INC.., a Delaware Corporation (hereinafter "MEDTRONIC"); KEITH JARO, an individual, and DOES 1-10, INCLUSIVE (collectively, "Defendants"), and each of them, jointly and severally, and for causes of action, alleges as follows:

## JURISDICTION & VENUE

1.      This Court has jurisdiction over this matter by virtue of Art. VI, § 10 of the California Constitution.

2.      Venue is proper in the County of Sonoma in that at all relevant times, the unlawful conduct occurred within the County of SonomaPlaintiff was a resident of the County of Sonoma and the effects of the discrimination and harassment were located in the County of Sonoma.

3.      Plaintiff has been damaged in excess of the jurisdictional amount of this Court.

## INTRODUCTION

4.      This is an action for damages and injunctive relief for Retaliation in violation of Cal. Lab. Code § 1102.5, the California Fair Employment & Housing Act ("FEHA") (Cal. Gov. Code § 12900, et seq.), as well as FEHA Sexual Orientation Discrimination, Disability Discrimination, and violation of the California Family Rights Act.  This action arises out of events involving Plaintiff Dr. RUSCHKE and his employment at MEDTRONIC.

## THE PARTIES

5.      Plaintiff DR. RUSCHKE is a male formerly employed by Defendants as a Chief Patent Counsel, until his termination on or about November 30, 2015.

2

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

6.     Defendant MEDTRONIC, is an employer within the meaning of the California Fair Employment and Housing Act ("FEHA") because it regularly employs in excess of five employees, licensed to and doing business in the State of California.

7.     Defendant KEITH JARO is an individual who at all times relevant, upon information and belief, was a resident of Sonoma County, California, and is responsible for the acts complained of herein.

8.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1-10, inclusive, and Plaintiff therefore sues such defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences, acts, and omissions alleged herein and that Plaintiff's injuries as alleged herein were proximately caused by such aforementioned defendants.

9.     Plaintiff is informed and believes, and therefore alleges, that at all times mentioned herein defendants were the agents, servants, employees and/or joint venturers of the other defendants and were, as such, at all times mentioned acting within the scope, course and authority of this agency, employment and/or joint venture. Plaintiff is further informed and believes and, therefore alleges, that each of the defendants consented to, ratified, participated in, or authorized the acts of the remaining defendants. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

## FACTS COMMON TO ALL CAUSES OF ACTION

10.    RUSCHKE is a highly qualified and recognized patent attorney, who previously served as Secretary of the American Intellectual Property Law Association ("AIPLA") and a member of its Board of Directors and Executive Committee.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

11.     After earning a Ph.D. in Chemistry from the Massachusetts Institute of Technology, DR. RUSCHKE worked for three years as a Research Chemist at W. R. Grace and Company in Colombia, MD.  He then graduated Magna Cum Laude from Georgetown University Law Center, where he served as a law review editor.

12.     Thereafter, DR. RUSHCKE spent three years clerking at the U.S. Court of Appeals for the Federal Circuit, first for Chief Judge Glenn Archer, Jr. and then Judge Arthur Gajarsa.  DR. RUSCHKE was the only patent counsel employed by MEDTRONIC during his entire tenure, who previously served as a Federal Circuit clerk.

13.     Immediately prior to joining MEDTRONIC, DR. RUSCHKE worked four years as an Associate Attorney at the Washington D.C. office of Covington & Burlingon.

14.     DR. RUSCHKE became employed by MEDTRONIC commencing in May of 2004, first as Senior Patent Counsel, then as Chief Patent Counsel (Senior Director level).

15.     Despite DR. RUSCHKE's excellent performance, MEDTRONIC terminated its more than decade-long relationship with him, without notice and without cause, on November 30, 2015 in an allegedly single-person reduction-in-force ("RIF").

16.     In May 2004, DR. RUSCHKE began working at MEDTRONIC's corporate headquarters in Fridley, MN.  Until Summer 2006, he reported to Tom Berry ("Mr. Berry"), Chief Patent Counsel ("CPC") of MEDTRONIC; he then briefly reported to Mike Jaro ("Mr. Jaro"), the former Chief Patent Counsel of MEDTRONIC.

17.     DR. RUSCHKE's job responsibilities were comprised of supporting half of MEDTRONIC's entire Corporate Research and Development ("R&D") group, including patent prosecution, contract management, and compliance support.

18.     In or about December 2006, General Counsel of MEDTRONIC, Terry Carlson, promoted DR. RUSCHKE into a position where DR. RUSCHKE took over Mr. Jaro's previous position in

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   Santa Rosa, California as Chief Patent Counsel of the Vascular business unit.  DR. RUSCHKE's

2   extensive litigation background and Federal Circuit experience were prime motivators for this

3   promotion.  DR. RUSCHKE's compensation reflected the value of his skill set and experience,

4   including a shared appreciation loan of $250,000 to compensate for California's high cost of

5   living, a perquisite reserved for Vice Presidents, not Senior Directors, which is commonly

6   waived by MEDTRONIC.

7

8   19.     For nine years, DR. RUSCHKE's performance at MEDTRONIC was rated as

9   outstanding, given his substantial contribution to MEDTRONIC's patent and litigation strategies

10  and the substantial impact his work and leadership have had on the company's bottom line.  For

11  example, DR. RUSCHKE's strategic vision was responsible for savings to MEDTRONIC in the

12  millions of dollars.  DR. RUSCHKE singlehandedly identified defects in certain competitor's

13  patents that resulted in over $50 million in annual savings of royalty payments to that competitor,

14  comprising over half the total annual royalty burden. This accomplishment was touted at the

15  highest levels of the company by Mr. Jaro and Ms. Van Hecke.

16

17  20.     In another matter, the Edwards Heart Valve Litigation, DR. RUSCHKE's actions resulted

18  in the invalidation of every single European patent of MEDTRONIC's competitor Edwards,

19  including a patent that had been used to enjoin MEDTRONIC from selling its CoreValve product

20  in all of Europe. DR. RUSCHKE's actions permitted MEDTRONIC to resume selling its

21  CoreValve product more than a year earlier than expected, resulting in renewed sales of over

22  $500 million annually.

23

24  21.     During the Abbott Coronary Stent Litigation, DR. RUSCHKE was solely responsible for

25  implementing the strategy that ended the injunction against MEDTRONIC selling its stents using

26  a rapid exchange delivery system, a system demanded by doctors as well as MEDTRONIC's

27  sales force. DR. RUSCHKE's  strategy permitted sales of the "Endeavor" and "Resolute"

28

5

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

coronary stents in the United States to resume three years prior to what had been expected prior

to his arrival at CardioVascular and what MEDTRONIC's competitors had asserted in court and

at the USPTO.   MEDTRONIC's sales of those stents comprised the vast majority of the $3

billion annual revenue of CSH department. DR. RUSCHKE was awarded the Star of Excellence

for his strategy for his work in lifting the rapid exchange injunction.

22.      DR. RUSCHKE also used his expertise at the Federal Circuit to avoid an injunction in the

United States, and trigger the settlement of over a decade of worldwide litigation at significant

savings to MEDTRONIC, which had internally estimated its exposure at $1.2 billion, but which

ultimately settled for less than half that amount. Abbott's counsel specifically told

MEDTRONIC's Corporate litigation team that DR. RUSCHKE's efforts were of primary

significance in getting Abbott to agree to settle for so much less.

23.      The amount of money directly attributable to DR. RUSCHKE's efforts from (1) the

amount of patent litigation expense that over the years DR. RUSCHKE was able to reduce or

avoid due to his efforts in the US and EPO to invalidate troublesome patents, (2) royalty and

other licensing revenue protected or added to (e.g., the Jervis and Fogarty patents that support

well over $30 million in annual royalty revenue) because of his successful defense of competitor

attacks against those royalty-bearing patents, and (3) the aggressive identification of IP issues

and negotiation during corporate acquisitions, has resulted in well over $100 million to the

bottom line of MEDTRONIC.   Despite this record of achievement, MEDTRONIC abruptly and

unexpectedly terminated DR. RUSCHKE's employment, offering a mere 10 weeks of severance.

24.      In Santa Rosa, DR. RUSCHKE reported directly to David Whitescarver ("Mr.

Whitescarver"), the General Counsel of the Vascular business unit (Coronary and Endovascular).

DR. RUSCHKE retained a "dotted line" reporting relationship to Mr. Jaro, even though the two

essentially had no contact or communication.  Moreover, Mr. Whitescarver instructed DR.

6

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

RUSCHKE upon arrival to reorganize the group, including terminating Mr. Jaro's part-time assistant and personal friend, Christine Aceves.

25.     From in or about May 2007 until in or about late 2010, DR. RUSCHKE reported on a solid line basis to Neil Ayotte ("Mr. Ayotte"), General Counsel of the newly formed CardioVascular business unit (comprised of Coronary, Endovascular, and Structural Heart). Again, DR. RUSCHKE maintained a dotted line reporting relationship with Mr. Jaro with virtually no contact or communication between them.

26.     From in or about late 2010 to 2012, DR. RUSCHKE reported on a dotted line basis to Jean Holloway ("Ms. Holloway"), General Counsel of the newly formed Cardiac and Vascular Group ("CVG").  Ms. Holloway interviewed DR. RUSCHKE for the position of Vice-President and General Counsel of Cardiac Rhythm and Disease Management ("CRDM"), the largest business unit within MEDTRONIC.

27.     Around this time, Mr. Jaro persuaded Cam Findlay ("Mr. Findlay"), General Counsel of MEDTRONIC, Inc. that the company's intellectual property attorneys should all report directly to him.  DR. RUSCHKE participated at very high level throughout this period, including the development of the department's mission statement and three-year strategic plan through an Organization Working Group.

28.     DR. RUSCHKE's effectiveness in the Organizational Working Group was recognized by Human Resources employee Rachael Sullivan ("Ms. Sullivan").  DR. RUSCHKE also received extensive positive feedback from Mr. Jaro as to his effectiveness in that Working Group.  Before Mr. Findlay's departure from MEDTRONIC, he had informed DR. RUSCHKE that he was moving Mr. Jaro to a position in China and that DR. RUSCHKE would be Mr. Jaro's successor as Chief Patent Counsel of all of MEDTRONIC, Inc.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

29.     From in or about 2012 to Summer 2014, DR. RUSCHKE had a dotted line reporting relationship with Mr. Ayotte, who had become General Counsel of CVG.  During this time, DR. RUSCHKE took issue with the hiring of employee Elaine Stracker ("Ms. Stracker") for Renal Denervation ("RDN").  It became immediately clear that Ms. Stracker's hiring, at the last minute before the open headcount window closed, was a mistake as she was a polarizing figure within his team.  In consultation with Human Resources ("HR"), she was moved away from RDN and into Coronary and DR. RUSCHKE was told by HR not to inform her why she was being so moved.

30.     Ultimately, Ms. Stracker created such division on the team that, without DR. RUSCHKE being informed, she was moved to report to David Bruce ("Mr. Bruce") in business legal.  The General Manager of RDN informed Mr. Ayotte shortly thereafter that she needed to go, as she had raised a potential issue with RDN payments to clinical trial doctors. She was let go by MEDTRONIC immediately.

31.     Upon information and belief, Mr. Ayotte (and perhaps Mr. Jaro) had Human Resources in Santa Rosa go behind DR. RUSCHKE's back and ask his team about Ms. Stracker, which DR. RUSCHKE did not learn about until after Ms. Stracker was fired.

32.     Just prior to the termination of Ms. Stracker's employment, DR. RUSCHKE's confidential salary and bonus information sent from Mr. Jaro in Minnesota by confidential mail was opened by someone in Santa Rosa.  DR. RUSCHKE contacted Security in Santa Rosa who was very concerned about this but sated that because there were no cameras in the area of where mail was delivered to view, there was not much further that could be done.

33.     When DR. RUSCHKE informed Mr. Jaro and Mr. Ayotte about the security breach they merely said "that's too bad" or words to that effect.  DR. RUSCHKE also informed Human

8

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Resources about the tampering, and Anne Colombo specifically stated "let it go" and refused any further action.

34.    When DR. RUSCHKE found out that Human Resources and Mr. Ayotte had been engaged in undermining DR. RUSCHKE's authority with respect to Ms. Stracker for almost a year, DR. RUSCHKE complained again to Anne Colombo that he felt that was a hostile work environment for a manager to work under.  Although this occurred in or about October of 2012, MEDTRONIC took no action to investigate or remediate the hostile work environment until DR. RUSCHKE's subsequent 2015 complaint concerning disparate treatment on the basis of sexual orientation.

35.    DR. RUSCHKE suffered professional harm by Ms. Stracker's deficient work performance in RDN, as Mr. Jaro cited her as a negative factor in DR. RUSCHKE's annual performance review.  After Ms. Stracker's dismissal, however, Mr. Jaro later "vindicated" DR. RUSCHKE in his next performance review by demonstrating that he had been right all along to raise issues about Ms. Stracker.

36.    During a meeting in 2012 between DR. RUSCHKE, Mr. Jaro, Mr. Ayotte, and Mr. Bruce about Ms. Stracker, DR. RUSCHKE was sharply criticized by the group.  DR. RUSCHKE told the participants that it was inappropriate to attack him this way, particularly in front of peer-level colleagues.  Rather than take the matter seriously, Mr. Jaro and Mr. Ayotte informed DR. RUSCHKE that the problem was his own perception, and that he should simply not feel that he was being attacked.  DR. RUSCHKE complained about the conduct of this meeting, and that his work environment was becoming increasingly hostile.  Again, neither Human Resources nor MEDTRONIC management performed any investigation of the complaint or took any steps to remediate what was becoming an increasingly hostile work environment.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

37.     In or about July 2015, DR. RUSCHKE's annual performance review was performed face-to-face in Minnesota.  This had never occurred previously in his more than decade service to MEDTRONIC.   Contrary to MEDTRONIC's practice, DR. RUSCHKE had no prior access to the review, and was not provided the ability to respond using the on-line tools used for all other MEDTRONIC legal employees.   Rather, a written performance review was handed to him in hard copy immediately at the beginning of the session attended by Mr. Jaro and Vice President/General Counsel of CVG, Betsy van Hecke, who had taken over from Mr. Ayotte.

38.     During the July, 2015 meeting, DR. RUSCHKE asked for specific examples of the behaviors he allegedly exhibited—including being non-communicative and "operating in silos." Ms. van Hecke could only recall a single example of not rescheduling a meeting.  After Ms. van Hecke left the room visibly angry and waiving her finger at DR. RUSCHKE, Mr. Jaro fist-bumped DR. RUSCHKE and said that he had done a great job of defending himself.  Mr. Jaro informed him that his annual bonus had been reduced by 10% as "punishment" for not timely submitting his expense reports during times that DR. RUSCHKE had not been assigned any administrative help.

39.     In July 2015, after his annual performance review, DR. RUSCHKE was immediately called into a surprise meeting called by Human Resources.  At the meeting, Mr. Jaro and Ms. Colombo served DR. RUSCHKE with a warning letter regarding his expense reports.  They informed him that the company would pay for his expenses (although only back to a certain date) if he submitted them in less than a month, and if he signed the warning letter.

40.     DR. RUSCHKE never signed the letter but submitted as many expenses as possible—but not all within the one-month deadline.  Kathy Daas ("Ms. Daas") of Expense Express was not cooperative in returning pending expenses to system to be processed and as a result he was not

able to begin processing expense reports until approximately two weeks into the one-month period imposed upon him.

41.    Thereafter, Mr. Jaro's assistant sent out meeting invitations to discuss the "Warning Letter." The meetings were rescheduled under a more innocuous description after DR. RUSCHKE complained to Mr. Jaro that his calendar was visible to his assistant.

42.    In or about July or August 2015, DR. RUSCHKE was summoned to another meeting with Mr. Jaro and Mr. Froehle without any advance warning as to the subject matter of the meeting. DR. RUSCHKE was sent a detailed memorandum approximately 2 minutes after the start of the meeting detailing expectations for him regarding: (a) his response time to e-mails, teleconferences, etc.; (b) his employee engagement survey response plan; (c) his 360 review list; and (d) his attendance at "Coordination Meetings" with each of them.

43.    The "Coordination Meetings" became a source of contention because Mr. Jaro more than once yelled at DR. RUSCHKE in front of Mr. Froehle, even when Mr. Jaro had given no indication that he was angry or that the meeting was significant or important to Mr. Jaro. In fact, on one occasion Mr. Jaro told DR. RUSCHKE immediately prior to a coordination meeting that he didn't think the meeting was necessary and on another occasion he simply failed to attend. Mr. Jaro had also responded negatively when DR. RUSCHKE requested to reschedule a coordination meeting in October because of a calendaring error by his assistant who failed to recognize time zone changes.

44.    DR. RUSCHKE was informed that he needed to include the entirety of the detailed memorandum, including all of the detailed expectations therein, as part of his yearly objectives, even though such yearly objectives are to be and have always been negotiated rather than unilaterally imposed. Thereafter, DR. RUSCHKE complained to Ms. Colombo in Human

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Resources that the memorandum was essentially a setup or roadmap to a performance improvement plan and even termination.

45.     In September 2015, despite experiencing heart attack symptoms, DR. RUSCHKE attended a meeting held in Minnesota which also included Mr. Jaro, his senior leadership team (the CPCs, Aaryn Wadadli, and a new addition Betsy O'Brien), Ms. Joan Hume, and Mr. Brad Lerman, the new General Counsel.  The purpose of the meeting was to brainstorm on possible structures for the Intellectual Property Legal Group following a merger with Covidien.

46.     Specifically, two options were discussed: (1) maintaining the status quo where all continued to report directly to Mr. Jaro, or (2) where Intellectual Property attorneys would report to the General Counsels of each business unit.  Mr. Lerman indicated, without elaboration, that a "hybrid" approach was likely.  During the meeting, DR. RUSCHKE participated fully and was vocally supportive of Mr. Jaro, who later thanked DR. RUSCHKE by e-mail for his support. As was his usual behavior at these meetings with Mr. Jaro and his leadership team, DR. RUSCHKE was very participatory.

47.     DR. RUSCHKE had questions concerning the warning letter he received as part of his 2015 performance evaluation, and addressed those concerns with Ms. Colombo.  DR. RUSCHKE complained specifically about the idiosyncratic and unprecedented restrictions on his exercise of professional discretion.

48.     Ms. Colombo is an individual authorized to receive reports of discrimination in the workplace.

49.     The substance of DR. RUSCHKE's complaint was that the restrictions on DR. RUSCHKE's exercise of discretion were so unprecedented and out of the ordinary for someone of DR. RUSCHKE's experience and performance, that DR. RUSCHKE could only conclude that they were being imposed because of his sexual orientation.  Ms. Colombo abruptly terminated

12

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

the conversation stating, "Now that you have used that 'G-word' I have to stop the conversation," or words to that effect.

50.     Immediately afterward, Ms. Colombo apparently raised DR. RUSCHKE's complaint with Michelle Miller (VP of employment law)  and then later informed DR. RUSCHKE that someone external from MEDTRONIC would be contacting him to discuss whether the issues rise to the level of hostile work environment.  DR. RUSCHKE questioned the propriety of a third-party discussing such matters with him.  DR. RUSCHKE never spoke with an external investigator and to his knowledge no further investigation by Ms. Colombo or Ms. Miller occurred.

51.     In October 2015, while attending a conference in Brazil, DR. RUSCHKE requested rescheduling of his Coordination Meeting with Mr. Jaro and Mr. Froehle.  Mr. Jaro vehemently refused.  His behavior was so erratic that DR. RUSCHKE called Ms. Colombo to complain about Mr. Jaro's behavior.  DR. RUSCHKE explained to her that the rescheduling was necessary because of a scheduling conflict due to an accidental double-booking by his assistant.  DR. RUSCHKE asked her to speak with Mr. Jaro and then follow up with him, which did not occur.

52.     Throughout most of the month of October, 2015, DR. RUSCHKE experienced atrial fibrillation.  Prior to November 4, 2015, DR. RUSCHKE informed Mr. Jaro and Ms. Colombo that he would be having a cardiac procedure (cardioversion) because of the atrial fibrillation he was experiencing.

53.     Atrial Fibrillation is a serious medical condition, which can have a massive impact upon various major life activities, primarily in reducing the patient's ability to engage in activities that increase the heart rate, including walking, running, climbing stairs, engaging in heated exchanges, and the like.

13

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

54.     On November 30, 2015, DR. RUSCHKE was called to a meeting with Mr. Jaro; however, when DR. RUSCHKE arrived, Mr. Jaro was joined by Ms. Colombo.  DR. RUSCHKE had no advance notice of his meeting, other than an e-mail inquiry from Mr. Jaro whether he would be in the office on the Monday after Thanksgiving.  At the meeting, Mr. Jaro and Ms. Colombo notified DR. RUSCHKE that he was being laid off in a one-man Reduction in Force ("RIF").

55.     DR. RUSCHKE was shocked, learned that when Mr. Jaro told his senior leadership team of the layoff, he was asked whether the RIF was part of the restructuring discussed at the meeting in Minnesota the preceding month.  Mr. Jaro replied,  no, that DR. RUSCHKE's layoff was separate from that.

56.     DR. RUSCHKE asked if Mr. Jaro knew the effect this would have on Dr. RUSCHKE's career and he said "yes."  DR. RUSCHKE asked about the timing of the one-person RIF with respect to all of his health issues and Ms. Colombo responded simply "that's what COBRA is for."

57.     When DR. RUSCHKE asked what the business rationale for the one-man RIF was, Mr. Jaro told him that it was based on money to fund another position and that DR. RUSCHKE would be the only Chief Patent Counsel of a business unit affected, and that no other similar positions in any of the other groups (Diabetes, RTG, or MITG) were being created.

58.     DR. RUSCHKE asked Mr. Jaro what it was that he had done to bring them to this point in their decade long relationship, and Mr. Jaro responded that he wasn't "following MEDTRONIC's rules" and that he hadn't "minded his P's and Q's".

59.     When DR. RUSCHKE asked Mr. Jaro for examples of such behavior, the only example given to DR. RUSCHKE was that he hadn't acknowledged his previous performance review, to which he responded that he had told Ms. Colombo that he couldn't acknowledge it because it

14

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

contained so many inaccuracies.  At this point, Ms. Colombo told Mr. Jaro he should leave the meeting.

60.     This "Reduction in Force" apparently applied to a single person—DR. RUSCHKE—which in and of itself is highly suspect.   Given (a) the size of MEDTRONIC and its patent work and efforts, and (b) the years of institutional knowledge and top performance of DR. RUSCHKE in terms of millions in savings to the company's bottom line, and the lack of a clear explanation of the reasons for the alleged "Reduction in Force", it is that the "Reduction in Force" is mere pretext.

**A.     Structure Prior to Acquisition of Covidien**

61.     In August 2014, General Counsel Brad Lerman ("Mr. Lerman") initiated a reorganization of the legal department in anticipation of MEDTRONIC's acquisition of Covidien Ltd. ("Covidien") in late January 2015.   At this time, there were four General Counsels who reported directly into business: Betsy van Hecke ("Ms. van Hecke") – CVG; Brian Ellis ("Mr. Ellis") – Restorative Therapies Group ("RTG"); Eric Geismar ("Mr. Geismar") – Diabetes; and Larry Weiss ("Mr. Weiss") – MITG/Covidien Group.  DR. RUSCHKE reported on a dotted line basis to Ms. van Hecke.

62.     The entire Intellectual Property Legal function changed from reporting directly to Mr. Lerman to Deputy General Counsel Joan Humes ("Ms. Humes"), essentially demoting the entire intellectual property function one level.  All Senior Directors then reported one level below where they did previously: DR. RUSCHKE reported to Steve Froehle ("Mr. Froehle") on a dotted line basis; Ted Lopez ("Mr. Lopez") reported to Mr. Bruce on a dotted line basis; Steve Bauer ("Mr. Bauer") retained his dotted line relationship to Ms. van Hecke.   Mr. Lopez was a former report of DR. RUSCHKE, who was promoted to Senior Director without any notice of

15

consultation to DR. RUSCHKE, resulting in part of DR. RUSCHKE's responsibilities being taken away from him.

63.     As a result of the new reporting structure, DR. RUSCHKE approached Ms. Colombo about holding a Roles and Responsibilities meeting regarding himself and Mr. Froehle. MEDTRONIC's Human Resources held such a meeting, attended by DR. RUSCHKE, Ms. Colombo, Ms. Sullivan, Ms. van Hecke, Mr. Jaro, and Mr. Froehle.

64.     The tone of the meeting as quite confrontational, with nearly all of the attendees taking an accusatory tone with DR. RUSCHKE.  Mr. Jaro did not attend the entirety of the meeting, leaving approximately two-thirds of the way through it.  Notwithstanding the tone, DR. RUSCHKE left the meeting reaching out to Mr. Froehle and expressing a strong desire to work with Mr. Froehle to make their relationship a positive working environment.

65.     In or around Fall 2014, Ms. van Hecke formed her senior leadership team for CVG.  The CPCs consisted of DR. RUSCHKE, Mr. Bauer, and Mr. Lopez.  The General Counsels included Mr. Froehle, Mr. Bruce, and Liz Revnew-Wolf ("Ms. Revnew-Wolf") and a female attorney from the Neuro business in RTG, both of whom were promoted to Senior Director, over other qualified and longer-serving male attorneys.

**B.     Structure Post-Covidien Acquisition- January, 2015 to Present**

66.     In or around mid-January 2015, DR. RUSCHKE was informed telephonically by Mr. Jaro and Ms. Colombo that Mr. Lopez, his direct report, would be promoted to Senior Director, and that DR. RUSCHKE would no longer have responsibility for the Endovascular and Peripheral business units, which would be combined to form the Aortic Peripheral Vascular ("APV") business unit.

67.     This was shocking to DR. RUSCHKE because Mr. Jaro had recently told him that he would retain all of his business units and responsibilities post acquisition of Covidien, and that

16

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

his responsibilities would actually increase as a result of the acquisition.  Mr. Jaro and Ms. Colombo remained silent when DR. RUSCHKE asked them whether the change was because of Ms. van Hecke.

68.     As part of the Covidien acquisition, MEDTRONIC assigned one IP attorney to perform the pre-acquisition due diligence of Covidien's intellectual property: DR. RUSCHE.  In the Covidien acquisition, a key conclusion from the IP due diligence review was that Covidien's IP counsel was greatly overstaffed, and overtitled.

69.     Also in or about January 2015, Mr. Jaro informed DR. RUSCHKE that his request for reimbursement of overdue expenses had been denied.  Mr. Jaro had him then write an e-mail to explain why his expense reports were late that Mr. Jaro would then send as if he had written it himself.  Mr. Jaro apparently sent the email and was subsequently informed by Ms. Daas that DR. RUSCHKE's expenses were again denied.

70.     .  DR. RUSCHKE was told that no appeal was possible, nor was any information as to how denials were decided, or by whom.  Mr. Jaro suggested that DR. RUSCHKE speak with an attorney because Mr. Jaro agreed with him that MEDTRONIC was obligated to pay for his expenses irrespective of any internal policy, noting that MEDTRONIC had made exceptions to their internal policy in the past.  DR. RUSCHKE did not hear anything regarding this issue, assuming that he would have to absorb all of the costs himself (on the order of tens of thousands of dollars), until July 2015 when he received the warning letter.

71.     In or about spring of 2015, Mr. Jaro moved Patent Counsel II Michelle Shen ("Ms. Shen") "unofficially" from his group to DR. RUSCHKE's group.  Ms. Shen had performed poorly in Mr. Jaro's group, where she had reported to Mr. Girma Wolde-Michael.  However, Mr. Jaro was intent on saving Ms. Shen's job as she was an Asian-American woman whom he had

pushed to hire.  DR. RUSCHKE's group did not need Ms. Shen, but she was accepted as "free" help since Corporate agreed to pay for her during Fiscal Year 2015.

72.     During Spring 2015, DR. RUSCHKE, Mr. Jaro, Ms. van Hecke, and Mr. Froehle met to discuss personnel resources for CSH.  At this meeting, the decision was made to use a "Reduction in Force" against one of DR. RUSCHKE's intellectual property attorneys, Mike Harms ("Mr. Harms").  This "Reduction in Force" did not occur prior to DR. RUSCHKE's termination from MEDTRONIC.  The group also decided to move patent agent Jim Keogh ("Mr. Keogh") from R&D to Intellectual Property Legal.  Shortly after this meeting, a patent agent from DR. RUSCHKE's group, Lisa Ison ("Ms. Ison"), took a position with another company. She was never replaced.

73.     The resulting cost-savings of the foregoing changes demonstrates that MEDTRONIC's claim that DR. RUSCHKE's one-person RIF was required as a cost-saving measure, is completely without merit, as a substantial amount of headcount reduction was either already authorized or had occurred by attrition, including the creation of a small highly-suspect and pretextually narrow RIF pool, including only Ted Lopez and Steve Bauer in addition to DR. RUSCHKE..

74.     The foregoing changes have resulted in an unprecedented and troubling structure within MEDTRONIC.  The one-person reduction-in-force effectuated upon DR. RUSCHKE has resulted in the first time, to our knowledge, that a business unit of MEDTRONIC is left without a Chief Patent Counsel.  This glaring departure from long-standing organizational structure within MEDTRONIC causes us substantial concern, as it speaks to a motivation other than a legitimate business purpose, which as set forth below, is evidence of pretext.

75.     DR. RUSCHKE's sexual orientation is gay, and throughout his time at MEDTRONIC has been openly gay.

18

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

76.    DR. RUSCHKE also has a history of heart problems.  In August 1999, he had a stroke and as a result underwent open heart surgery to replace a faulty aortic valve.

77.    In or about 2013, DR. RUSCHKE began experiencing renewed heart trouble.  This required multiple emergency room visits, multiple new medications and medication changes, and substantial increased monitoring by his cardiologists.   MEDTRONIC was aware of these issues at the time, and thereafter.

78.    In January 2015, DR. RUSCHKE was informed by his cardiologist that he likely would have to have open heart surgery again to repair his aortic valve, a development which he reported to his supervisors.

79.    In September 2015, DR. RUSCHKE experienced severe heart issues while climbing the stairs at work to attend a QBR meeting, which most likely was a minor heart attack.

80.    In November, 2015, after a month of heart issues while traveling on company business, he suffered another incident and underwent a cardioversion treatment.

81.    On November 30, 2015 MEDTRONIC terminated DR. RUSCHKE's employment, and later rescinded that Notice of Termination, then reinstated the Notice of Termination.

82.    As part of the the termination, DR. RUSCHKE was forced to exercise stock options that he ordinarily would not have exercised, based upon the failure of MEDTRONIC to communicate with him concerning whether he was required to exercise such options.

83.    As a direct and proximate result of MEDTRONIC's failure to communicate with DR. RUSCHKE, he was forced to exercise options earlier than he ordinarily would have, resulting in a loss in excess of $100,000.

84.    In January, 2016, DR. RUSCHKE underwent a second cardioversion.  These conditions adversely impacted DR. RUSCHKE's major life activities, requiring accommodations in terms of leave and working conditions.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## FIRST CAUSE OF ACTION
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
### (*TAMENY*)
### (Alleged Against METRONIC and DOES 1-10, inclusive)

85.   As a first, separate and distinct cause of action, Plaintiff complains of Defendants, and for a cause of action, alleges:

86.   The factual allegations of Paragraphs 1 through 84 above, are re-alleged and incorporated herein by reference.

87.   California's common law recognizes a tort for the termination of employment in violation of a strong public policy. *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 (*Tameny*).

88.   An employer-employee relationship existed between MEDTRONIC and RUSCHKE during all relevant time periods.

89.   An employer-employee relationship existed between MEDTRONIC and RUSCHKE during all relevant time periods.

90.   MEDTRONIC and MEDTRONIC took adverse action against RUSCHKE by terminating his employment.

91.   The termination of RUSCHKE's employment was in violation of the strong public policies of the State of California, set forth in the California Fair Employment and Housing Act's (Cal. Gov. Code. §12940 et. seq.) prohibition against discrimination in the workplace, retaliation for engaging in protected activity, and interference with an employee's rights under the California Family Rights Act.

92.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered and will continue to suffer pain and mental anguish and emotional distress.

93.   Plaintiff has further suffered and will continue to suffer a loss of earnings and other employment benefits, whereby Plaintiff is entitled to general compensatory damages in amounts to be proven at trial.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

94.     Defendants' actions constituted a willful violation of the above-mentioned state laws.  As a direct result, Plaintiff has suffered, and continues to suffer, substantial losses related the loss of wages and is entitled to recover costs and expenses and attorney's fees in seeking to compel Defendants to fully perform their obligation under state law and her respective damage amounts according to proof at time of trial.

95.     The conduct of Defendants described herein above was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

96.     Defendants, through its officers, managing agents, employees and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct described herein above.  By reason thereof, Plaintiff is entitled to an award of punitive damages in an amount according to proof at the time of trial.

97.     Defendants committed the acts alleged herein by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights.  Plaintiff is thus entitled to recover nominal, actual, compensatory, punitive, and exemplary damages in amounts according to proof at time of trial, in addition to any other remedies and damages allowable by law.

WHEREFORE, Plaintiff prays judgment as set forth below.

## SECOND CAUSE OF ACTION
### DISABILITY DISCRIMINATION
(Cal. Gov. Code § 12940 et. seq.)
**(Alleged Against METRONIC and DOES 1-10, inclusive)**

98.     As a second, separate and distinct cause of action, Plaintiff complains of Defendants, and for a cause of action, alleges:

99.     The factual allegations of Paragraphs 1 through 97 above, are re-alleged and incorporated herein by reference.

21

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

100.    From in or about January, 2004 through January, 2016, Plaintiff was employed by MEDTRONIC.

101.    As set forth above, Plaintiff had serious physical conditions that limited his major life activities, making him disabled under the California Fair Employment and Housing Act.

102.    Plaintiff was also perceived by MEDTRONIC management as being disabled under the California Fair Employment and Housing Act.

103.    Plaintiff was singled out for termination by Defendants, and each of them, while his non-disabled counterparts were not subjected to termination, and was further prohibited from being considered for the Vice President position, despite the fact that he had been treated as a Vice President for years at MEDTRONIC.

104.    Defendants have no legitimate business reason for terminating Plaintiff and refusing to consider him for the position of Vice President.

105.    Plaintiff's disabilities were a substantial motiving factor in the termination of his employment and the refusal to consider him for the position of Vice President.

106.    As a direct and proximate result of the actions of Defendants, Plaintiff has suffered and will continue to suffer pain and mental anguish and emotional distress.

107.    Plaintiff has further suffered and will continue to suffer a loss of earnings and other employment benefits, whereby Plaintiff is entitled to compensatory damages in amounts to be proven at trial.

108.    Defendants' actions constituted a willful violation of the above-mentioned state laws.  As a direct result, Plaintiff has suffered, and continues to suffer, substantial losses related the loss of wages and is entitled to recover costs and expenses and attorney's fees in seeking to compel Defendants to fully perform their obligation under state law and her respective damage amounts according to proof at time of trial.

22

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

109.    The conduct of Defendants described herein above was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

110.    Defendants, through its officers, managing agents, employees and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct described herein above.  By reason thereof, Plaintiff is entitled to an award of punitive damages in an amount according to proof at the time of trial.

111.    Defendants committed the acts alleged herein by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights.  Plaintiff is thus entitled to recover nominal, actual, compensatory, punitive, and exemplary damages in amounts according to proof at time of trial, in addition to any other remedies and damages allowable by law.

WHEREFORE, Plaintiff prays judgment as set forth below.

### THIRD CAUSE OF ACTION
### RETALIATION
**(Cal. Gov. Code § 12900, *et seq.*)**
**(Alleged Against METRONIC and DOES 1-10, inclusive)**

112.    As a third, separate and distinct cause of action, Plaintiff complains of Defendants, and for a cause of action, alleges:

113.    The factual allegations of Paragraphs 1 through 111 above, are re-alleged and incorporated herein by reference.

114.    Jurisdiction is invoked pursuant to Cal. Gov. Code § 12965, as amended, seeking injunctive relief and damages for violations of the Plaintiff's employment rights as protected by the FEHA, Cal. Gov. Code § 12940, et seq., which prohibits retaliation against an employee for making complaints and protesting or refusing to participate in discriminatory employment practices prohibited by the FEHA.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

115.   Plaintiff was an employee of Defendants and is a person protected by the provisions of the FEHA as he engaged in the protected activity by complaining of a disparate treatment.

116.   Defendants are employers, covered by and subject to the FEHA, as they are licensed to and doing business in the State of California, and have at least five (5) employees.

117.   As alleged herein, DR. RUSCHKE's protected activity was clear and unambiguous: "is this because I'm gay?" or words to that effect in his meeting with Ms. Colombo concerning the letter of reprimand and his 2015 performance review.

118.   Furthermore, we believe that other protected activities may be uncovered by further investigation, including whether DR. RUSCHKE's earlier complaints were perceived by Ms. van Hecke or others as complaints about disparate treatment based on protected classes.

119.   Following Plaintiff's protected activity, he was subjected to a pattern of adverse employment actions, including termination.

120.   At all relevant times, Defendants and its supervisors, agents, and/or officers, engaged in and/or ratified by their actions and/or inaction through their employees and/or supervisors, acts of retaliation against based upon Plaintiff's protected activities.

121.   In so doing the act and engaging in the activities alleged herein, Defendants, through their officers, employees, and agents, did intend to retaliate against Plaintiff for his exercise of rights under the FEHA and cause Plaintiff to suffer emotional distress.

122.   As a direct and proximate result of the willful, knowing, and intentional retaliation by Defendant, Plaintiff has suffered and continues to suffer the loss of earnings and related employment benefits, mental distress, anguish, and indignation.  He is thereby entitled to general and compensatory damages in an amount to be proven at trial.

24

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

123.   The conduct of Defendants described herein above was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

124.   Defendants, through its officers, managing agents, employees and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct described herein above.  By reason thereof, Plaintiff is entitled to an award of punitive damages in an amount according to proof at the time of trial.

125.   Defendants committed the acts alleged herein by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights.  Plaintiff is thus entitled to recover nominal, actual, compensatory, punitive, and exemplary damages in amounts according to proof at time of trial, in addition to any other remedies and damages allowable by law.

126.   As pleaded above, Plaintiff has duly exhausted his administrative remedies, obtaining a Right to Sue on November 11, 2016.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

**FOURTH CAUSE OF ACTION**
**SEXUAL ORIENTATION DISCRIMINATION (DISPARATE TREATMENT)**
**(Cal. Gov. Code § 12900, *et seq.*)**
**(Alleged Against METRONIC and DOES 1-10, inclusive)**

127.   As a fourth, separate and distinct cause of action, Plaintiff complains of Defendants, and for a cause of action, alleges:

128.   The factual allegations of Paragraphs 1 through 126 above, are re-alleged and incorporated herein by reference.

129.   The FEHA (Cal. Gov. Code § 12940(a)) provides that it is an unlawful employment practice for an employer, because of the sexual orientation of any person to bar or to discharge

25

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.

130.   Plaintiff is a member of a class protected by FEHA: he is a gay male.

131.   As demonstrated above, Plaintiff RUSCHKE performed the duties of his job competently, and at the time he suffered the adverse employment actions set forth above, was qualified and competent to perform the essential job functions of his position.

132.   Defendants, through their agents and employees, engaged in a pattern and practice of unlawful sexual orientation discrimination in violation of FEHA in connection with its disparate treatment of Plaintiff, and the terms and conditions of his employment, including termination.

133.   At all relevant times, Defendants and their supervisors, agents, and/or officers, engaged in and/or ratified by their actions and/or inaction through their employees and/or supervisors, acts of discrimination against Plaintiff RUSCHKE based upon his protected class.

134.   As a direct result of the acts and conduct of Defendants as alleged herein, Plaintiff RUSCHKE has suffered a loss of earnings and related employment benefits in an amount to be proven at trial herein.

135.   As a direct and proximate result of the willful, knowing, and intentional discrimination against her, Plaintiff has suffered mental distress, anguish, and indignation.  He is thereby entitled to general and compensatory damages in an amount to be proven at trial.

136.   The conduct of Defendants described herein above was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

137.   Defendants, through its officers, managing agents, employees and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct described herein above.  By reason

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   thereof, Plaintiff is entitled to an award of punitive damages in an amount according to proof at

2   the time of trial.

3   138.    Defendants committed the acts alleged herein by acting knowingly and willfully, with the

4   wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting

5   to malice, and in conscious disregard of Plaintiff's rights.  Plaintiff is thus entitled to recover

6   nominal, actual, compensatory, punitive, and exemplary damages in amounts according to proof

7   at time of trial, in addition to any other remedies and damages allowable by law.

8

9   139.    As pleaded above, Plaintiff has duly exhausted his administrative remedies, obtaining a

10  Right to Sue on November 11, 2016.

11  WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

12                          **FIFTH CAUSE OF ACTION**
13            **FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS**
                          **(Cal. Gov. Code § 12900, *et seq.*)**
14            **(Alleged Against METRONIC and DOES 1-10, inclusive)**

15  140.    As a fifth, separate and distinct cause of action, Plaintiff complains of Defendants, and

16  for a cause of action, alleges:

17
18  141.    The factual allegations of Paragraphs 1 through 139 above, are re-alleged and

19  incorporated herein by reference.

20  142.    The FEHA (Cal. Gov. Code § 12940(a)) provides that it is an unlawful employment

21  practice for an employer, to fail to engage with a disabled employee in an interactive process to

22  determine whether it can accommodate the limitations presented by the employee's disability.

23  143.    Plaintiff is a member of a class protected by FEHA: he suffers from atrial fibrillation and

24  the consequent limitations of major life activities which may increase the heart rate.

25
26  144.    As demonstrated above, MEDTRONIC knew, at all relevant times that DR. RUSCHKE

27  was disabled, yet it failed to take any action whatsoever to engage with DR. RUSCHKE to

28  accommodate his disabilities after becoming aware of them.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

145.   At all relevant times, Defendants and their supervisors, agents, and/or officers, engaged in and/or ratified by their actions and/or inaction through their employees and/or supervisors, in failing to engage in the interactive process with Plaintiff RUSCHKE.

146.   As a direct result of the acts and conduct of Defendants as alleged herein, Plaintiff RUSCHKE has suffered a loss of earnings and related employment benefits in an amount to be proven at trial herein.

147.   As a direct and proximate result of foregoing acts and conduct, Plaintiff has suffered mental distress, anguish, and indignation.  He is thereby entitled to general and compensatory damages in an amount to be proven at trial.

148.   The conduct of Defendants described herein above was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

149.   Defendants, through its officers, managing agents, employees and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct described herein above.  By reason thereof, Plaintiff is entitled to an award of punitive damages in an amount according to proof at the time of trial.

150.   Defendants committed the acts alleged herein by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights.  Plaintiff is thus entitled to recover nominal, actual, compensatory, punitive, and exemplary damages in amounts according to proof at time of trial, in addition to any other remedies and damages allowable by law.

151.   As pleaded above, Plaintiff has duly exhausted her administrative remedies, obtaining a Right to Sue on November 11, 2016.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## SIXTH CAUSE OF ACTION
### FAILURE TO ACCOMMODATE
#### (Cal. Gov. Code § 12900, *et seq.*)
#### (Alleged Against METRONIC and DOES 1-10, inclusive)

152.  As a sixth, separate and distinct cause of action, Plaintiff complains of Defendants, and for a cause of action, alleges:

153.  The factual allegations of Paragraphs 1 through 151 above, are re-alleged and incorporated herein by reference.

154.  The FEHA (Cal. Gov. Code § 12940(a)) provides that it is an unlawful employment practice for an employer to fail to make reasonable accommodations for employees with disabilities.

155.  At all relevant times, Plaintiff suffered from disabilities, as set forth above.

156.  Defendants, with knowledge of Plaintiff's disabilities failed to accommodate his limitations on major life activities.

157.  At all relevant times, Defendants and their supervisors, agents, and/or officers, engaged in and/or ratified by their actions and/or inaction through their employees and/or supervisors, by failing to accommodate DR. RUSCHKE's disabilities.

158.  As a direct and proximate result of the acts and conduct of Defendants as alleged herein, DR. RUSCHKE has suffered a loss of earnings and related employment benefits in an amount to be proven at trial herein.

159.  As a direct and proximate result of the willful, knowing, and intentional failure to accommodate, Plaintiff has suffered mental distress, anguish, and indignation.  He is thereby entitled to general and compensatory damages in an amount to be proven at trial.

160.  The conduct of Defendants described herein-above was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

161. Defendants, through its officers, managing agents, employees and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct described herein above. By reason thereof, Plaintiff is entitled to an award of punitive damages in an amount according to proof at the time of trial.

162. Defendants committed the acts alleged herein by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover nominal, actual, compensatory, punitive, and exemplary damages in amounts according to proof at time of trial, in addition to any other remedies and damages allowable by law.

163. As pleaded above, Plaintiff has duly exhausted her administrative remedies, obtaining a Right to Sue on November 11, 2016.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

### SEVENTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA LABOR CODE §203
### (Cal. Gov. Code § 12900, *et seq.*)
### (Alleged Against METRONIC and DOES 1-10, inclusive)

164. As a seventh, separate and distinct cause of action, Plaintiff complains of Defendants, and for a cause of action, alleges:

165. The factual allegations of Paragraphs 1 through 163 above, are re-alleged and incorporated herein by reference.

166. Defendants terminated DR. RUSCHKE's employment.

167. At the time Defendants terminated DR. RUSCHKE's employment, Defendants failed to pay DR. RUSCHKE all remuneration, including salary, wages, bonuses, reimbursement of expenses and other remuneration due and payable to DR. RUSCHKE.

168. As a direct and proximate result of Defendant's wrongful acts, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking substitute employment and in earnings,

30

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

bonuses, deferred compensation, stock options, seniority, and other employment benefits; and has suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

169.    Pursuant to California Labor Code Section 203, DR. RUSCHKE is entitled to waiting time penalties.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

**EIGHTH CAUSE OF ACTION**
**FALSE LIGHT**
**(Alleged against all Defendants)**

170.    As an eighth, separate and distinct cause of action, Plaintiff complains of Defendants and for a cause of action alleges:

171.    The factual allegations of Paragraphs 1 through 169 above, are re-alleged and incorporated herein by reference.

172.    The timing and nature of the termination of RUSCHKE'S employment MEDTRONIC's timing and its handling of the termination of DR. RUSCHKE' employment left DR. RUSCHKE in an extremely awkward position vis a vis his professional duties as a preeminent patent attorney. For example, MEDTRONIC placed an out-of-office email response on DR. RUSCHKE's primary email (used for his professional AIPLA duties, among others) that contained a false statement:

> David Ruschke has departed MEDTRONIC. For immediate assistance, please contact Mindy Jones (707-591-2837 or mindy.jones@MEDTRONIC.com; <mailto:mindy.jones@MEDTRONIC.com>) who will route you to the appropriate MEDTRONIC personnel for follow-up.

That statement was false. DR. RUSCHKE was employed by MEDTRONIC through January 29, 2016. DR. RUSCHKE was not allowed to have any input into how his public-facing data interfaces represented the change in his status.

31

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

173.    In addition to the public-facing email that MEDTRONIC had used to showcase DR. RUSCHKE as one of its Chief Patent Counsels, MEDTRONIC imposed further false statements in the out-of-office voicemail response, that stated similar information:  that DR. RUSCHKE has "departed MEDTRONIC" or words to that effect.   This conduct precluded DR. RUSCHKE from warning his contacts, and preparing his professional network for the fact that he would no longer be working with MEDTRONIC.

174.    Gaps in employment can be devastating to employees, and whatever benefit MEDTRONIC may have provided to DR. RUSCHKE by permitting him to remain on the payroll for two months was completely vitiated by the out-of-office messages, particularly when MEDTRONIC refused to provide him with his contacts for almost the entire two months, and when it did so, it provided them in a format that was unusable to DR. RUSCHKE.

175.    The messages implied that DR. RUSCHKE chose to leave and had already left and had told no one.  Such a no-notice departure would be highly out-of-character for such a distinguished patent counsel, and implied job abandonment.

176.    The false implication of fact has negatively impacted DR. RUSCHKE's professional reputation and has severely damaged his long-term earning capacity.  By not allowing DR. RUSCHKE to correct these messages, it placed DR. RUSCHKE in a false light.

177.    The refusal of MEDTRONIC to cooperate in the portability of the telephone number DR. RUSCHKE used for his AIPLA duties, (707) 566-1746, resulted in the number being sent to a "the number has been disconnected".

178.    These actions caused DR. RUSCHKE to be portrayed as having fallen off the face of the earth or abandoned his job. That impression is an anathema to DR. RUSCHKE's hard-earned reputation as a seasoned patent counsel, and is offensive to a reasonable person.

32

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

179.     The false implications of these facts has negatively impacted RUSCHKE's professional reputation and has severely damaged his long-term earning capacity.

180.     The false impression that RUSCHKE, a highly-experienced security professional at the Director level, was responsible for the failure of security permitting the data breach is "highly offensive to a reasonable person."

181.     Defendants' acts alleged herein are malicious, oppressive, despicable, and/or in reckless disregard of Plaintiff's rights.  As such, punitive and exemplary damages are warranted against Defendants in order to punish and make an example of their actions.

182.     As a proximate result of Defendant's wrongful acts, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking substitute employment and in earnings, bonuses, deferred compensation, stock options, seniority, and other employment benefits; and has suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.  For a mandatory injunction, requiring Defendants to take affirmative steps to remedy discriminatory and retaliatory behavior at Defendants, including a reinstatement and restoration of all benefits;

2.  For general and compensatory damages in amounts according to proof and in no event in an amount less than the jurisdictional limit of this Court;

3.  For special damages in amounts according to proof;

4.  For punitive and exemplary damages to deter future unlawful conduct;

5.  For attorneys' fees as provided by law;

6.  For interest as provided by law;

7.  For costs of suit herein; and

8.  For such other and further relief as the Court deems fair and just.

33

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Dated: November 13, 2017                    SMITH PATTEN

                                            DOW W. PATTEN
                                            Attorney for Plaintiff
                                            DR. DAVID RUSCHKE


## JURY DEMAND

Plaintiff hereby demands trial by jury of all matters so triable.


Dated: November 13, 2017                    SMITH PATTEN

                                            DOW W. PATTEN
                                            Attorney for Plaintiff
                                            DR. DAVID RUSCHKE

34

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF